**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **M.O.**, individually, and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>**BRIGHTVIEW LLC d/b/a BRIGHTVIEW HEALTH**,<br><br>*Defendant.* | Case No.<br><br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiff M.O., individually and on behalf of all similarly situated persons, alleges the following against BrightView LLC d/b/a BrightView Health ("BrightView" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## I.    INTRODUCTION

1.      A person's struggle with substance abuse or addiction is among the most sensitive, and closely guarded facets of their life.

2.      The unwanted disclosure of such information can be enormously harmful. It can impact an individual's reputation, livelihood, and personal relationships. And, if people struggling with addiction are unable to trust that the organizations purporting to offer assistance will protect their sensitive, private information, they are much less likely to seek help when they need it most.

1

3. Unfortunately, unbeknownst to Plaintiff and other visitors to Defendant's website, Defendant does not keep sensitive information about its visitors private. Instead, Defendant records the fact that its website visitors, like Plaintiff and Class Members, are seeking treatment services for drug or alcohol addiction, requesting an introductory call to seek assistance with regard to drug or alcohol addiction, and scheduling or re-scheduling appointments for drug or alcohol addiction treatment (collectively, "Sensitive Information"), and transmits that information to third parties, including Alphabet, Inc. ("Google"), through its use of surreptitious online tracking tools.

4. Online advertising giants, like Google, compile as much information as possible about American consumers, including the most private aspects of their lives, as fuel for a massive, targeted advertising enterprise. Thus, any information about a person captured by those online behemoths can be used to stream ads to that person. If Google receives information that a person is struggling with unpaid debt, it will use that information, and allow its clients to use that information, to stream ads to that person's computers and smartphones relating to debt relief products and services.

5. Google offers website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

6. But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information

provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

7. In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their customers' privacy.

8. BrightView is one of the many companies that has chosen to prioritize its marketing efforts over its customers' privacy, by installing Google's Tracking Tools on its website.

9. BrightView is a medical provider specializing in addiction treatment services, including programs tailored for drug, alcohol, opioid, fentanyl, heroin and meth addiction, operating in seven states.[1] Defendant's website – www.brightviewhealth.com (the "Website") – allows potential clients to research its programs, request an appointment, request a call from Defendant, and manage existing appointments.[2]

10. Plaintiff and Class Members visited the Website and had their personal Sensitive Information tracked by Defendant using the Tracking Tools. However, Defendant ***never*** obtained authorization from Plaintiff or Class Members to share their Sensitive Information with third parties. At all times relevant to this action, Plaintiff and Class Members gave no informed consent

---

[1] *About Our Addiction Treatment Program*, BRIGHTVIEW https://www.brightviewhealth.com/about-us/ (last visited Jan. 5, 2025).

[2] *Id*.

for information about their Sensitive Information to be transmitted to the third parties, including the largest advertiser and compiler of user information on earth.

11.     As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with online service providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Information; (vi) statutory damages and (viii) continued and ongoing risk to their Sensitive Information.

12.     Therefore, Plaintiff seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and asserts the following statutory and common law claims against Defendant: Invasion of Privacy, Breach of Confidence, Breach of Fiduciary Duty, Negligence, Breach of Implied Contract, Unjust Enrichment, and violations of the Electronic Communications Privacy Act ("ECPA"), Pennsylvania Wiretapping and Electronic Surveillance Control Act, Pennsylvania Unfair Trade Practices and Consumer Protection Law, and Ohio Consumer Sales Practices Act.

## II.     <u>PARTIES</u>

### *Plaintiff M.O.*

13.     Plaintiff M.O. is a citizen of the Commonwealth of Pennsylvania, residing in Delaware County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

14.     In or around January of 2023, Plaintiff M.O. utilized Defendant's Website on her personal electronic device to request an appointment for addiction treatment services in the same manner as depicted in Sec. IV(A)(d), *infra*.

4

15. Plaintiff M.O. never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties, including the Sensitive Information that she provided to Defendant.

16. On every occasion that she visited Defendant's Website, Plaintiff M.O. possessed an account with Google, and she accessed Defendant's Website while logged into her Google account on the same device.

17. After providing her Sensitive Information to Defendant through the Website, Plaintiff M.O. immediately began seeing targeted online advertisements for addiction treatment services.

***Defendant BrightView LLC***

18. Defendant BrightView LLC d/b/a BrightView Health is a limited liability corporation incorporated in the State of Delaware, with its principal place of business at 4600 Montgomery Road, Suite 400, Cincinnati, OH 45212, in Hamilton County.

## III.     JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

20. This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in this District. Further, Defendant is authorized to and

regularly conduct business in this District and make decisions regarding corporate governance and management of the Website in this District, including decisions regarding the privacy of User's Sensitive Information and the incorporation of the Tracking Tools.

21.     Venue is proper in this District under 28 U.S.C. § 1391(a)- (d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiff's and Class Members' Sensitive Information; Defendant's principal place of business is located in this District; and Defendant caused harm to Class Members residing in this District.

## IV.     FACTUAL ALLEGATIONS

### A.  DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### a.  Google's Mass Advertising Surveillance Operation

22.     Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[3] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[4]

23.     Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users,"

---

[3] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Jan. 5, 2025).

[4] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Jan. 5, 2025).

"check the performance of [their] marketing," and "[g]et insights only Google can give."[5] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[6]

24.     Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[7]

25.     Google also admits that it uses the information collected from third party websites, such as Defendant's, to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[8]

26.     While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, the vague descriptions of Google's data collection practices referenced above could not give Plaintiff and Class Members any reason to think that Defendant was part of Google's surveillance network. Moreover, as Defendant does not disclose its use of Google's Tracking Tools, Plaintiff and Class Members could not have been

---

[5]     *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Jan. 5, 2025).

[6] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Jan. 5, 2025).

[7] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Jan. 5, 2025).

[8] *Id*.

reasonably expected to review any of Google's privacy statements in connection with their use of the Website

27. Google aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[9] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[10]

28. Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[11] and Google trackers are present on 74-percent of all web traffic.

29. Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

---

[9] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one_way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[10] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Jan. 5, 2025).

[11] Narseo Vallina-Rodriguez & Srikanth Sundaresan*, 7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Jan. 5, 2025).

a. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[12] In fact, Google advertising trackers were found on 73-percent of pornography websites.[13]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Google and/or Facebook to access subscriber information, including health diary entries and self-reports about substance abuse.[14]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[15] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[16]

30. This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[17]

---

[12] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[13] *Id.*

[14] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[15] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited Jan. 5, 2025).

[16] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited Jan. 5, 2025).

[17] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Jan. 5, 2025).

31.     In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[18]

32.     When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network, and in return they benefit from Google's collection of user data, at the expense of their website users' privacy. For example, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[19]

33.     In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[20] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[21]

34.     Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[22]

---

[18] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 5, 2025) ("Google Analytics gives you the tools, free of charge"),

[19] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Jan. 5, 2025).

[20] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[21] *Id.*

[22] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

**b. Pixels Can Record Almost Every Interaction Between a User and a Website**

35. In order to use Google's Business Tools, Defendant installed Google's Tracking Tools, including tracking Pixels, onto its website.

36. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[23]

37. Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[24]

38. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

---

[23] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Jan. 5, 2025).

[24] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Jan. 5, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Jan. 5, 2025).

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[25]

### c. The Pixels Installed on Defendant's Website Transmit Personally Identifiable Information to Google

39.     Every website is hosted by a computer "server" that holds the website's contents.

40.     To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

41.     Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

42.     Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[26] These cookies

---

[25] *Lurking Beneath the Surface, supra* note 23.

[26] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Jan. 5, 2025).

are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[27] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[28]

43. When a Google user logs onto their account, their web browser records a Google tracking cookie.[29] This cookie includes a specific line of code that links the web browser to the user's Google account.[30]

44. Google's Pixels use cookies, but operate differently than cookies. Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user. The information can include details about the user, his or her interactions with the Website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device).

45. Simultaneously, the Google Pixels, like those installed on Defendant's Website, request identifying information from any Google cookies previously installed on the user's web browser.

46. The Pixel then combines the data it received from the browser with the data it acquired from the cookie, and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels on the Defendant's Website to the user's identity, via the user's Google profile. Thus, even if a user never

---

[27] *Id.*

[28] *Id.*

[29] Cyphers, *supra* note 9.

[30] *Id.*

actually logs into a website, or fills out a form, the website, along with Google, can know the user's identity.

47.     A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[31] When these users visit a website, like Defendant's, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

48.     However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.

49.     Google's Pixels, like those on Defendant's website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

50.     An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[32] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[33] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint

---

[31] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Jan. 5, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Jan. 5, 2025).

[32] Cyphers, *supra* note 9.

[33] *Id.*

becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

### d. Defendant Disclosed Plaintiff's and Class Members' Sensitive Information to Google.

51.     To obtain or reschedule an appointment with Defendant, Plaintiff and Class Members were required to complete online contact and scheduling forms on Defendant's Websites.

52.     Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Google Pixels installed on its Website to capture and transmit the Sensitive Information that they communicated to Defendant while completing these online forms.

53.     The below screenshot ("Figure 1") of network transmission data from the Website shows that when Website users schedule an appointment using Defendant's Website, the Google Pixels on Defendant's Website transmit the fact that the user is scheduling an appointment for Defendant's addiction rehabilitation treatment to Google.

54.     Further, the information transmitted to Google was accompanied by specific lines of code linking the Sensitive Information provided by Plaintiff to their identities. As Figure 1 shows, the Google Pixel on Defendant's website transmitted the identifier number attached to Google's '_cid' and '_sid' cookies, which are used to identify the user's Google account and link the user's Website behavior to their identity, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, operating system software and version number, and internet browser software and version number.



*Figure 1. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Google when Website users schedule an appointment.*

55. Likewise, the screenshot below ("Figure 2") shows that when Website users submit a request for a free consultation for addiction treatment, the Pixels installed on Defendant's Website transmit the fact that the user requested a call back related to Defendant's "drug addiction treatment program" to Google, alongside the identifier number attached to Google's '_cid' and '_sid' cookies, and other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, operating system software and version number, and internet browser software and version number.



*Figure 2. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Google when Website users request a call.*

56.    Defendant also informs Google when its current patients use the Website to modify an appointment. The screenshot below ("Figure 3") shows that when Website users reschedule an appointment, the Pixels installed on Defendant's Website transmit the fact that the user rescheduled an appointment with a Brightview "Health Rehab" through Defendant's 'Patient Portal,' alongside the identifier numbers attached to Google's '_cid' and '_sid' cookies, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, operating system software and version number, and internet browser software and version number.



*Figure 3. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Google when Website users use its Patient Portal to reschedule an appointment.*

57.     By installing third-party Tracking Tools, including tracking Pixels, on its Website, and by further configuring those Pixels to collect its Website user's Sensitive Information, Defendant knowingly and intentionally caused Plaintiff's and Class Members' Sensitive Information to be transmitted to third parties, including Google.

B. **DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT**

a. **Defendant failed to inform Plaintiff and Class Members of its disclosure of their Sensitive Information, in violation of its Privacy Policy**

58.     Defendant's Privacy Policy promises that "is required by law to maintain the privacy and confidentiality of your health information" and that it does not disclose information to third parties without permission.[34] Defendant's Privacy Policy makes no mention of the Tracking Tools installed on its Website.[35]

59.     Defendant never specifically disclosed to Plaintiff or Class Members that their Sensitive Information will be sent to third parties for any purposes, nor has Defendant ever obtained informed consent from Plaintiff or Class Members to do so.

60.     Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Information to third parties, including Google. Specifically, Plaintiff and Class Members had a reasonable expectation of privacy (based on Defendant's own representations to Plaintiff and the Class) that Defendant would not disclose their Sensitive Information to third parties. Defendant did not inform Plaintiff or Class Members that it was sharing their Sensitive Information with third parties, including Google.

61.     By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant violated its own Privacy Policy and breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Information.

---

[34] *Privacy Policy*, BRIGHTPOINT, https://www.brightviewhealth.com/privacy-policy/ (last accessed Jan. 5, 2025).

[35] *Id.*

62.     Despite never telling users like Plaintiff and Class Members, Defendant allowed third parties such as Google to intercept Plaintiff's and Class Members' Sensitive Information and use it for advertising purposes.

### b. The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members

63.     The Tracking Tools installed on Defendant's Website were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by Defendant's Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiff and Class Members, were unable to detect the Tracking Tools on Defendant's Website.

64.     Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Information would be disclosed to any unauthorized third party without their express consent.

65.     Plaintiff and Class Members did not know that their Sensitive Information was being collected and transmitted to an unauthorized third party.

66.     Because Plaintiff and Class Members were not aware of the Google Pixels on Defendant's website, or that their Sensitive Information would be collected and transmitted to Google, they could not and did not consent to Defendant's conduct.

### C. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

### a. Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Information

67. As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on their website.

68. Upon information and belief, Defendant, as a user of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiff's and Class Members' Sensitive Information.

**b. Plaintiff's and Class Members' Data Had Financial Value**

69. Moreover, Plaintiff's and Class Members' Sensitive Information had value, and Defendant's disclosure and interception of that Sensitive Information harmed Plaintiff and the Class.

70. According to the financial statements of Facebook, another major seller of online advertisements, the value derived from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[36]

71. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

---

[36] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Jan. 5, 2025).

72.     Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

73.     The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Information has diminished the value of that information, resulting in harm including Plaintiff and Class Members.

## D.   PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

74.     At all times when Plaintiff and Class Members provided their Sensitive Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Information with third parties for a commercial purpose, unrelated to providing addiction treatment services.

75.     Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

76.     For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[37]

77.     Americans are particularly sensitive about disclosing struggles with drug and alcohol addiction. Numerous studies have noted that feelings of shame often cause those struggling

---

[37] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Jan. 5, 2025).

with addiction to avoid seeking treatment.[38] As a result, "only 13 percent of people with drug use disorders receive any treatment."[39]

78.     Personal data privacy and obtaining consent to share Sensitive Information are material to Plaintiff and Class Members.

79.     Plaintiff relied on the statements made by Defendant, including in its Privacy Policy, when deciding to communicate their Sensitive Information to it through its Website.

## V.     TOLLING AND ESTOPPEL

80.     Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Google's Tracking Tools into its website.

81.     The Pixels and other tracking tools on Defendant's Website were and are invisible to the average website visitor.

82.     Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

83.     Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

---

[38] *See* R Hammarlund, KA Crapanzano, L Luce, L Mulligan & KM Ward, *Review of the effects of self-stigma and perceived social stigma on the treatment-seeking decisions of individuals with drug- and alcohol-use disorder*, SUBST. ABUSE & REHABIL. (2018), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC6260179/#sec1; Abigail W Batchelder, Tiffany R Glynn, Judith T Moskowitz, Torsten B Neilands, Samantha Dilworth, Sara L Rodriguez & Adam W Carrico, *The shame spiral of addiction: Negative self-conscious emotion and substance use*, PLOS ONE (2022), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC8932605/.

[39] Dr. Nora Valkow, *Making Addiction Treatment More Realistic and Pragmatic: The Perfect Should Not be the Enemy of the Good*, NATIONAL INSTITUTE ON DRUG ABUSE (Jan. 4, 2022), https://nida.nih.gov/about-nida/noras-blog/2022/01/making-addiction-treatment-more-realistic-pragmatic-perfect-should-not-be-enemy-good#:~:text=Recent%20data%20from%202020%20shows,use%20disorders%20receive%20any%20treatment (last visited Jan. 5, 2025).

84.     Defendant had exclusive knowledge that its Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to customers, including Plaintiff and Class Members, that by requesting and managing addiction treatment appointments through Defendant's Website, Plaintiff's and Class Members' Sensitive Information would be disclosed or released to unauthorized third parties, including Google.

85.     Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Sensitive Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Sensitive Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

86.     Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

87.     The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI.     CLASS ALLEGATIONS

88.     This action is brought by the named Plaintiff on her own behalf, and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

89.     The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**The Nationwide Class**

All natural persons who used Defendant's Website to request or reschedule an appointment for addiction treatment services, and whose Sensitive Information was disclosed or transmitted to Google, or any other unauthorized third party.

90.   In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of separate Pennsylvania Subclass, which are defined as follows:

**Pennsylvania Subclass**

All natural persons residing in Pennsylvania who used Defendant's Website to request or reschedule an appointment for addiction treatment services, and whose Sensitive Information was disclosed or transmitted to Google, or any other unauthorized third party.

91.   Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

92.   Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

93.   **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 1,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

94.   **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a)   Whether and to what extent Defendant had a duty to protect the Sensitive Information of Plaintiff and Class Members;

b)      Whether Defendant had duties not to disclose the Sensitive Information of Plaintiff and Class Members to unauthorized third parties;

c)      Whether Defendant violated its own privacy policy by disclosing the Sensitive Information of Plaintiff and Class Members to third parties, including Google;

d)      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Information would be disclosed to third parties;

e)      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Information was being disclosed without their consent;

f)      Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Information;

g)      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

h)      Whether Defendant violated the statutes asserted as claims in this Complaint;

i)      Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j)      Whether Defendant knowingly made false representations as to its data security and/or privacy policy practices;

k)      Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

l)      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Information.

95.      **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

26

96. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

97. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties, like Google, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

98. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

99. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

100. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a) Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Information and not disclosing it to unauthorized third parties;

    b) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Information;

    c) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

    d) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Information would be disclosed to third parties;

    e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

    f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

101. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

<u>**COUNT I**</u>
**COMMON LAW INVASION OF PRIVACY - INTRUSION UPON SECLUSION**
<u>*(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania*</u>
<u>*Subclass)*</u>

102. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

103. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

104. Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communications platforms and services therein.

105. Plaintiff and Class Members communicated Sensitive Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

106. Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

107. Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's Privacy Policy and other representations.

108. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from

surreptitious disclosure to third parties.

109.    Defendant's disclosure of Plaintiff's and Class Members' Sensitive Information coupled with individually identifying information is highly offensive to the reasonable person.

110.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

111.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

112.    Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

113.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

114.    Plaintiff also seeks such other relief as the Court may deem just and proper.

<u>**COUNT II**</u>
**BREACH OF CONFIDENCE**
<u>*(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)*</u>

115.    Plaintiff repeats and realleges the allegations contained in paragraphs 102 through 114 as if fully set forth herein.

116.    Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential.

117.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on

Defendant's Website.

118.    Plaintiff's and Class Members' reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises in its Privacy Policy.

119.    Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant deployed the Tracking Technologies to disclose and transmit Plaintiff's and Class Members' Sensitive Information and the contents of their communications exchanged with Defendant to third parties.

120.    The third-party recipients included, but were not limited to, Google, and other online marketers.

121.    Defendant's disclosures of Plaintiff's and Class Members' Sensitive Information were made without their knowledge, consent or authorization, and were unprivileged.

122.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

123.    As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

   a.  Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

   b.  Defendant eroded the essential confidential nature of the provider-patient relationship;

   c.  Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensating Plaintiff and Class Members for the data;

   d.  Plaintiff and Class Members did not get the full value of the medical

services for which they paid, which included Defendant's duty to maintain confidentiality;

e. Defendant's actions diminished the value of Plaintiff's and Class Members' Sensitive Information, and

f. Defendant's actions violated the property rights Plaintiff and Class Members have in their Sensitive Information.

124. Plaintiff and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiff is also entitled to punitive damages.

## **COUNT III**
## **BREACH OF FIDUCIARY DUTY**
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)*

125. Plaintiff repeats the allegations contained in paragraphs 115 to 124 as if fully set forth herein.

126. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardian of Plaintiff's and Class Members' Sensitive Information, Defendant became a fiduciary by its undertaking and guardianship of the Sensitive Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Sensitive Information; (2) to timely notify Plaintiff and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

127. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with its patients and former patients, and in particular, to keep secure their Sensitive Information.

128. Defendant breached its fiduciary duties to Plaintiff and Class Members by

disclosing their Sensitive Information to unauthorized third parties, and separately, by failing to notify Plaintiff and Class Members of this fact.

129.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

**COUNT IV**
**NEGLIGENCE**
*(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania*
*Subclass)*

130.    Plaintiff repeats and realleges the allegations contained in paragraphs 125 through 129 as if fully set forth herein.

131.    Defendant required Plaintiff and Class Members to use its Website to request and manage appointments for addiction treatment services.

132.    By collecting and storing data related to these applications, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

133.    Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Information from being disclosed to third parties, without their consent, including to Google.

134.    Defendant further negligently omitted to inform Plaintiff and the Class that it would use their Sensitive Information for marketing purposes, or that their Sensitive Information would be transmitted to third parties.

135.    Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Information to Defendant, had Plaintiff and the Class

known that Defendant intended to use that information for unlawful purposes.

136.     Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Information accessed, stored, and disseminated without their knowledge or consent.

137.     Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

138.     Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)***

139.     Plaintiff repeats and realleges the allegations contained in paragraphs 130 through 138 as if fully set forth herein.

140.     When Plaintiff and Class Members provided their Sensitive Information to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Sensitive Information without consent.

141.     Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Information to Defendant.

142.     Plaintiff and Class Members would not have entrusted Defendant with their Sensitive Information in the absence of an implied contract between them and Defendant

obligating Defendant to not disclose Sensitive Information without consent.

143.     Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Information to third parties like Google.

144.     As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

145.     Plaintiff and Class Members would not have used Defendant's services had they known their Sensitive Information would be disclosed.

146.     Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

## COUNT VI
## UNJUST ENRICHMENT
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)*

147.     Plaintiff repeats and realleges the allegations contained in paragraphs 139 through 146 as if fully set forth herein.

148.     Plaintiff pleads this claim in the alternative to her breach of implied contract claim.

149.     Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided their Sensitive Information to Defendant, which it exchanged for marketing and advertising services, as described, *supra*.

150.     Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from the Sensitive Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

151.     In particular, Defendant enriched itself by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members'

Sensitive Information.

152.     Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of their Sensitive Information.

153.     Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, obtained by its surreptitious collection and transmission of their Sensitive Information.

154.     If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Information, they would not have agreed to provide their Sensitive Information to Defendant.

155.     Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damage.

156.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

157.     Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**COUNT VII**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**("ECPA")**
**18 U.S.C. § 2511(1), *et seq*.**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania***
***Subclass)***

158.     Plaintiff repeats and realleges the allegations contained in paragraphs 147 through 157 as if fully set forth herein.

159. The ECPA protects both sending and receipt of communications.

160. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

161. The transmissions of Plaintiff's Sensitive Information to Defendant's Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

162. <u>Electronic Communications</u>. The transmission of Sensitive Information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

163. <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

164. <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

165. <u>Electronical, Mechanical or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.   Plaintiff's and Class Members' browsers;

b.   Plaintiff's and Class Members' computing devices;

c.   Defendant's web-servers; and

d.   The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

166.   By utilizing and embedding the Pixels on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

167.   Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Sensitive Information to third parties such as Google.

168.   Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Information, including the fact that they were suffering from drug or alcohol addiction, and their efforts to find treatment services for the same.

169.   By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

170.   By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

171. <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

172. The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

173. Defendant is not a party for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Information does not qualify for the party exemption.

174. Defendant's acquisition of sensitive communications that were used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

    a.     Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

    b.     Violations of the Pennsylvania Wiretapping and Electronic Surveillance Control Act;

    c.     Violations of the Ohio Consumer Sales Practices Act;

    d.     Invasion of privacy; and

    e.     Breach of confidence.

175. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members,

without user authorization; and disclosed Sensitive Information to Google without user authorization.

176.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Information on its Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Sensitive Information with Google and third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their Sensitive Information, and that Plaintiff and Class Members did not consent to receive their Sensitive Information.

177.    As such, Defendant cannot viably claim any exception to ECPA liability.

178.    Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b.    Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Information without providing any value or benefit to Plaintiff or Class Members;

c.    Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Information, such as understanding how people use its Website and determining what ads people see on its Website, without providing any value or benefit to Plaintiff or Class Members;

d.    The diminution in value of Plaintiff's and Class Members' Sensitive Information and/or the loss of privacy due to Defendant making such Sensitive Information, which Plaintiff and Class Members intended to remain private, no longer private.

179. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixels to track and utilize Plaintiff's and Class Members' Sensitive Information for financial gain.

180. Defendant was not acting under color of law to intercept Plaintiff's and the Class Members' wire or electronic communication.

181. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Tracking Tools.

182. Any purported consent that Defendant may claim it received from Plaintiff and Class Members was not valid.

183. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

184. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT VIII
### VIOLATIONS OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT ("WESCA")
### 18 Pa. Cons. Stat. § 5702; 5703, *et seq.*
### *(On Behalf of Plaintiff and the Pennsylvania Subclass)*

185. Plaintiff repeats and realleges the allegations contained in paragraphs 158 through 184 as if fully set forth herein.

186. The WESCA prohibits any person from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept any wire, electronic or oral communication[.]" 18 Pa. Cons. Stat. Ann. § 5703(1).

187. Defendant and Google are "persons" under 18 Pa. Cons. Stat. § 5702.

188. The Private Information communicated to Defendant by Plaintiff and Class Members through their use of the Website are "electronic communications" under 18 Pa. Cons. Stat. § 5702.

189. Defendant violated the WESCA by knowingly enabling Google's interception of Plaintiff's and Class Members' electronic communications by installing the Tracking Tools on its Website.

190. As a result of Defendant's violation of the WESCA, Plaintiff and Class Members are entitled to all damages available under 18 Pa. Cons. Stat. § 5725, including actual damages, statutory damages of up to $1,000 per violation, punitive damages, and attorney's fees and costs.

## COUNT IX
### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ("UTPCPL")
### 73 Pa. Stat. Ann. § 201-1, *et seq.*
### *(On Behalf of Plaintiff and the Pennsylvania Subclass)*

191. Plaintiff repeats and realleges the allegations contained in paragraphs 185 through 190 as if fully set forth herein.

192. The UTPCPL prohibits anyone from "[e]ngaging in any[]fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. Ann. § 201-2.

193. Defendant's knowing, intentional violations of the UTPCPL include:

    i.    Falsely promising that it would keep confidential and not disclose Plaintiff's and Class Members' Sensitive Information;

    ii.    Failing to inform Plaintiff and Class Members that it would provide their Sensitive Information to third parties in exchange for advertising and marketing services; and

    iii.    Surreptitiously collecting and sharing Plaintiff's and Class Members' Sensitive Information with third parties.

194.    As a result of Defendant's violation of the UTPCPL, Plaintiff and Class Members are entitled to all damages available under 73 Pa. Stat. Ann. § 201-9.2, including statutory damages of up to $100 per violation, equitable or declaratory relief, compensatory and treble damages, and attorney's fees and costs.

<u>**COUNT X**</u>
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT, Ohio Rev.
Code Ann. § 1345.01, *et seq.*
<u>*(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania
Subclass)*</u>**

195.    Plaintiff repeats and realleges the allegations contained in paragraphs 191 through 194 as if fully set forth herein.

196.    Defendant is headquartered in the State of Ohio where, upon information and belief, it made the decision to install the Tracking Tools on its Website, prepared its Website's content including its Privacy Policy, initiated and made decisions on how to manage its marketing and advertising operations, and processed inquiries and appointment requests submitted by individuals, like Plaintiff and Class Members, seeking its rehabilitation services.

197.    The Ohio Consumer Sales Practices Act prohibits any supplier from "commit[ing] an unfair or deceptive act or practice in connection with a consumer transaction…whether it occurs before, during, or after the transaction." Ohio Rev. Code Ann. § 1345.02.

198.     Defendant is a "supplier" under Ohio Rev. Code Ann. § 1345.01(C).

199.     Defendant's advertisement of, and solicitation of Plaintiff and Class Members to contract to receive its addiction rehabilitation services through its Website constitute "consumer transactions" under Ohio Rev. Code Ann. § 1345.01(A).

200.     Defendant's knowing, intentional violations of the Ohio Consumer Sales Practices Act include:

    i.     Falsely promising that it would keep confidential and not disclose Plaintiff's and Class Members' Sensitive Information;

    ii.     Failing to inform Plaintiff and Class Members that it would provide their Sensitive Information to third parties in exchange for advertising and marketing services; and

    iii.     Surreptitiously collecting and sharing Plaintiff's and Class Members' Sensitive Information with third parties.

201.     As a result of Defendant's violation of the Ohio Consumer Sales Practices Act, Plaintiff and Class Members are entitled to all damages available under Ohio Rev. Code Ann. § 1345.09, including noneconomic damages of up to $5,000 per violation, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff, on behalf of herself and other Class Members, pray for judgment against Defendant as follows:

    A.     an Order certifying the Nationwide Class, and Pennsylvania Subclass, and appointing the Plaintiff and her Counsel to represent the Classes;

    B.     equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Information of Plaintiff and Class Members;

    C.     injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests

of Plaintiff and Class Members;

D.    an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined but exceeding $5,000,001.00;

E.    an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.    prejudgment interest on all amounts awarded; and

G.    all such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.

Dated: January 15, 2025

Respectfully submitted,

/s/Christopher Wiest
Christopher Wiest (OH 0077931)
Chris Wiest, Attorney at Law, PLLC
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
chris@cwiestlaw.com

Tyler J. Bean*
Sonjay C. Singh*
SIRI & GLIMSTAD LLP
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: ssingh@sirillp.com

*pro hac vice admission anticipated*

**Attorneys for Plaintiff and the Class**